### PHILIPS, Administrator, &c., and others, *v.* BELDEN, Executrix of BELDEN, and others.

---

As a general rule, where an account is made up and rendered in due form, he to whom it is rendered is bound to examine the same or to procure some one to examine it for him ; and if he admits the account to be correct, it becomes a stated account and is binding upon both parties—the balance being the debt which may be sued for and recovered at law upon the basis of an *insimul computassent.* So, if instead of an express admission of the correctness of the account, the party receiving it keeps the same by him and makes no objection within a reasonable time, he will be considered, from his silence, as acquiescing and be equally bound by it as a stated account. If either party attempts to impeach the settlement and to open the accounts for re-examination, either wholly or in part—and which can only be done upon the ground of fraud, mistake or error—the burthen of proof rests upon the party impeaching and he must prove the fraud or point out the error or mistake on which he relies.

The cases allowing enquiry into accounts, where there has been a confidential relationship between the parties, do not extend the doctrine to a settled account between principal and land agent where there has been an actual accounting, even although there may have been great confidence and trust.

Equity gives great effect to the lapse of time and discourages claims not promptly made, especially where there has been no personal disability or other impediment.

Where enough appears, in a suit for account, to induce a belief of errors and that accounts require correction, it is the duty of the court to permit it to be done by giving leave to surcharge and falsify.

Parties, in being allowed to surcharge and falsify, will be limited to such matters as they have specifically alleged to be overcharges, errors and omissions.

Distinction between surcharging and falsifying and accounting generally : Where liberty is given to surcharge and falsify, the court takes the account to be a stated and settled account and establishes it as such. If either party can show an omission, for which an entry of debit or credit ought to be made, such party surcharges, i. e. adds to the account, and if any thing should be inserted which is wrong, he is at liberty to show it, and this is a falsification. The *onus probandi* is always on the party making the surcharge

1

or falsification; and if he fails to prove it, the account must stand as correct. But, in a general accounting, the party producing the account must show the items to be correct. O. and P. were owners of a large landed estate divided into farms. Many years ago they appointed T. B. their general agent to manage the estate and its tenantry and to agree with purchasers and to receive all the money and revenue arising from it. This agency continued to 1791, when A. B. (nephew to T. B.) was appointed sub-agent. In 1806, T. B. died; and A. B. became the general agent. Soon afterwards O. died, but the whole estate descended to P. who continued A. B. as such agent down to 1826. The powers of A. B. as given to him by O. and P. were those of a general agent and steward. O. and P. were in every way competent to scrutinize the accounts of A. B., but still they were averse to the trouble of it and relied entirely upon his integrity and went into no minute examination of them. He received money and acted generally in the agency; and from time to time shewed accounts, books of entries, vouchers, and copies of receipts given by him and paid balances as stated to the parties and they gave him receipts and acknowledged the accounts to be settled. HELD that this was different from a case of confidential relationship; and, upon a bill filed by P. in 1829. against A. B. for a general accounting, DECREED the accounts rendered and signed to be stated and settled accounts. But inasmuch as some particular errors and omissions were expressly charged, the court allowed the parties to surcharge and falsify as to these, but no further.

---

*Feb.* 23, 1833.

*Principal and Land Agent.*

*Settled Accounts.*

*Attorney and Client.*

*Surcharging and Falsifying.*

The original bill in this cause was filed in the month of February, one thousand eight hundred and twenty-nine, by Captain Frederick Philips, in his individual capacity, and as administrator of his mother, Margaret Ogilvie, deceased, (and to whom he was sole heir and next of kin,) against Amos Belden, for an account of his agency of their estates. The bill also sought to set aside a conveyance made by Captain Frederick Philips, and Samuel Gouverneur and Mary his wife to Amos Belden, of a farm on which he resided; and the complainants claimed payment of large sums of money growing out of his agencies, alleged to be due to the said Frederick Philips at the time the bill was filed, both in his own right and in his character of administrator of Mrs. Ogilvie.

Soon after filing the bill the original complainant died intestate; and the suit was revived by and in the name of his grandson, Frederick Philips, as his administrator, and who had also become administrator *de bonis non* of Mrs. Ogilvie, as well as in the names of Samuel Gouverneur and Mary, his wife: Mrs. Gouverneur being the daughter, sole heiress and next of kin of Captain Philips.

After the answer had been put in and proofs were closed, the defendant, Amos Belden, died; and the suit was then revived against the present defendants, who were the widow and children, executors and devisees of Amos Belden.

The cause was now heard upon pleadings and proofs, which were of very great length.

The following is a succinct history of the agency : Mrs. Ogilvie, and her son Captain Philips, were the owners of a very large landed estate, called Philip's Patent, comprising a large portion of what is now Putnam county. Thomas Belden, the uncle of Amos Belden, had the agency of these lands from a very early period. In the year one thousand seven hundred and ninety one, Mrs. Ogilvie and Captain Philips appointed Amos Belden the sub-agent or assistant to his uncle, who was continued in the agency, and whose powers did not entirely cease until near the period of his death, which took place in the year one thousand eight hundred and six. Amos Belden, at first, resided with his uncle, and acted, in some measure, under his direction ; but, gradually, the whole of the duty devolved upon him. On the fourth day of February one thousand eight hundred and seven, Mrs. Ogilvie died, being then almost eighty years of age ; and upon her demise, the whole estate descended to her son, Captain Philips, who, from this period, was the sole proprietor of the estates, and Amos Belden, his sole agent, down to about the close of the year one thousand eight hundred and twenty-six. The powers of the latter as receiver, both from Mrs. Ogilvie and Captain Philips, were those of a general agent and steward. The patent or manor was divided into farms ; and many of them were occupied by tenants.

Mr. Belden, as agent and steward, collected the rents, made contracts for leases, negociated sales of some of the lands to settlers, and prepared the leases and conveyances which the proprietors executed, and handed to him to be delivered—leaving it entirely to him to receive the consideration money, (where money was to be paid) or to take notes or bonds and mortgages for security, and to hold the same, and collect the principal and interest monies whenever due. And as he resided upon the patent, and the proprietors lived in New York, the general superintendence and management of the estate and its tenantry, and the agreeing with purchasers, and the receiving of money and the revenue, were confided to him. In this way large amounts of money came

into his hands during the time of his agency; and, for these he was to account.

The bill charged, in substance, as regarded Mrs. Ogilvie, that, by agreement, she was to allow him a commission of seven and a half per cent. on all monies he collected. That, from her great confidence in him, the bonds, rent-rolls, notes, &c. to a large amount, belonging to her, which had been in the hands of the uncle, Thomas Belden, her former agent, she permitted to pass into the possession of Amos Belden, without any inventory or statement being made of the same. Also, that no accounts of the estate, showing any disposition of the bonds and notes or of the lands sold or monies collected and disbursed, with vouchers, were ever furnished by him to Mrs. Ogilvie, nor did she ever call for such accounts; and she never examined even the imperfect statements which he did occasionally furnish—and, from her age, habits of life, and inexperience in accounts, she was incapable of making a proper examination of the same, while her confidence in him was such, as never made her think it necessary. The bill also alleged that a large amount of notes, bonds and money, belonging to Mrs. Ogilvie remained in his hands at the time of her death, in the year one thousand eight hundred and seven; and no account thereof had since been rendered to Captain Philips, although the same was frequently requested. That Captain Philips was easy and thoughtless in business matters, and, on account of having perfect confidence in this agent, never insisted on a settlement of Mrs. Ogilvie's accounts, until a short time before the filing of the bill, when the agent refused to settle the same, alleging his having made a full settlement with Mrs. Ogilvie, shortly before her death. That the complainant had lately discovered the fact of Mrs. Ogilvie's having, at different times, signed receipts in full, and accounts current for the agent as presented by him, on the credit side of which accounts a gross sum merely was entered, whilst, on the debit side, the charges were in detail, and Mrs. Ogilvie signed the same from a blind confidence, without examining the accounts or books or exhibiting or examining of vouchers, and in ignorance of the effect of the papers so signed. That, in such accounts, there were various overcharges, and,

amongst them, a demand of five per cent. commission on sales of land, in addition to a general compensation to the agent, which charge was unjust and unauthorized and unknown to Mrs. Ogilvie, and wholly unknown to the complainant until recently. The bill further stated, that the defendant, Amos Belden, never prepared, even upon his own books, any regular statement of the property of Mrs. Ogilvie remaining in his hands at her death, but continued to receive large sums of money from such property, and, in some cases, credited the same to the complainant, without making any distinction in his entries between such monies and those received from the individual estate of the complainant; and had so blended the accounts, that no fair and just settlement of them could be effected, until a similar settlement of his accounts with the complainant individually was made, and, *vice versa.*

The bill then set forth, that the agency of Mr. Belden for Captain Philips was of the same character as the one with Mrs. Ogilvie, and the compensation similar, until the year one thousand eight hundred and eleven, when the commission for his services was reduced to five per cent., in consideration of large sums, which he would thereafter have to receive from the sales of land—under an agreement for an appraisement of the farms to the tenants as purchasers. That a large amount of bonds, notes and other securities, with rent-rolls, deeds and maps, belonging to the complainant, came into his possession directly from Thomas Belden, the first agent, without passing through the hands of the complainant, and without any inventory or account having been furnished to him; and from the great confidence he had in both, the complainant permitted a transfer without requiring the same. And in addition to these, and during the time he was such agent, large sums of money, and a great number of other bonds, notes and securities belonging to the complainant, came into his hands. That, from the general habits of life of Captain Philips, and his total inexperience in business, and in keeping accounts, his aversions to the same, and on account of his unbounded confidence in the agent, he never took any part in the management of the estate, except in the execution of deeds and papers, and in performing such

other occasional acts as the agent suggested; and in all which cases, the complainant acted without any examination or knowledge of the subject, further than from information of the agent; and, in general, and throughout all the transactions, he reposed entirely upon the judgment of this agent. The bill then showed various transactions in relation to the estate, and of sales made to a large amount and monies received by the agent; charged the latter with acts of mismanagement and remissness of duty, whereby losses had been sustained; and impeached the fairness of his conduct and motives in becoming the purchaser and in procuring from the complainant, and Gouverneur and wife, a conveyance of the farm on which he resided as a tenant. That, at different times, the complainant had executed promissory notes to him for large amounts, at a time when he was entirely ignorant of the original consideration and merely upon the agent's representations, without any knowledge of the state of the accounts or any being furnished whereby he might have ascertained whether he was really indebted in the amount of such notes. That some of such notes were continued by renewals, with compound interest charged, and were finally taken up, by assigning various bonds and mortgages to the agent: all of which was done in ignorance of the true state of the accounts, and upon an entire trust of the good faith of the agent. The bill set forth several other transactions in relation to bonds and mortgages, in which the complainant alleged he had been overreached and defrauded. That in the year one thousand eight hundred and twenty-six, the agent obtained a note from him for two hundred and fifty one pounds six shillings and two pence, but did not furnish any statement of his general account, nor did the complainant examine any part of his accounts, but gave the note thoughtlessly, and relying entirely upon the representations of the agent, and believing all errors would be rectified on a general settlement. That, upon receiving monies at different times from the agent, this complainant had given receipts, which purported to be in full, and had also signed some of the accounts as correct; but, upon the signing of accounts and receipts in full, the complainant never examined the general account or

vouchers, nor were vouchers exhibited, and he put his name to them in ignorance of their true state, being extremely thoughtless in money matters, and particularly with the agent, for whom he was in the habit of signing all papers suggested by him, without reflection, and in full confidence. That he had not knowingly or intentionally released the agent from his general liability to account for his agency during the whole period of the time or any part of it. That he had lately called for an account of transactions commencing with the agency; and after various negociations, the agent had rendered an account, beginning with the year one thousand eight hundred and eight but refused to render any prior to that time, alleging a receipt in full to have been given up to this period; and that no account of the agency, since one thousand eight hundred and eight, shewing the agent's receipts and payments or how the property had ever been disposed of or what remained due at the times of obtaining the receipts in full, had ever been rendered.

The bill alleged the accounts rendered since the year one thousand eight hundred and eight, to be grossly defective, and as containing many improper charges; and proceeded to point them out. It prayed, amongst other things, a general account of both agencies, from the commencement of them.

The defendant, Amos Belden set up his accounts with Mrs. Ogilvie to within a short time of her death, as settled accounts; and the same thing with regard to his agency for Captain Philips, up to the twenty-sixth day of November, one thousand eight hundred and twenty-six: and, consequently, that the complainant was not entitled to call for a general account at the present period.

In support of the answer, and as evidence of the settlements, the defendant produced various stated accounts between him and Mrs. Ogilvie, and between him and Captain Philips, made at different times and in regular succession, and which had acknowledgments written at the bottom, explanatory of their being settled accounts, signed by the party, and then receipts subjoined, specifying the sums and payments of balances. The signatures were admitted to be genuine; and, in many instances, the bodies of the receipts and acknowledg-

1833.

PHILIPS
v.
BELDEN.

ments given by Captain Philips were in his own hand writing. The accounts exhibited by the defendant, as thus settled with Mrs. Ogilvie, commenced in the year one thousand seven hundred and ninety-two, and appeared to have been regularly continued, with settlements at reasonable distances, down to one thousand eight hundred and seven. On the ninth day of December, one thousand eight hundred and six, a short account was made up and the balance paid to her, when she signed a receipt, expressed to be in full for money on bonds and notes. On the twenty-first day of January, one thousand eight hundred and seven, Mrs. Ogilvie gave another receipt to Mr. Belden, for two hundred and sixty-two pounds, six shillings and three pence, in full for money collected of the tenants to that day. The accounts which the defendant exhibited, as settled between him and Captain Philips, commenced with the agency, in one thousand seven hundred and ninety-one, and terminated in the year one thousand eight hundred and twenty-six. The last of the series, embracing a period of nine months, from February to November, one thousand eight hundred and twenty-six, and made out (like the preceding accounts) in the form of debit and credit, giving the items in detail, with dates and sums, and stating a balance against Captain Philips of two hundred and fifty-one pounds, six shillings and two pence, was underwritten and signed by Captain Philips, as follows:

"Nov. 26. Settled—I giving my note for the balance due to Amos Belden, viz. £251. 6. 2." "Fred'k. Philips."

The following were the facts which the court deduced from the pleadings and proofs: As to Mrs. Ogilvie: the defendant made up accounts from time to time, as her agent, which, with the aid of books, contained all the particularity necessary to a full understanding of the different entries. These accounts he brought with him to the house of Mrs. Ogilvie, in the city of New York, where he lodged during the time he remained in the city; and there he submitted them to her inspection and examination. He likewise generally brought his original book of accounts with him, containing the general account current between him and Mrs. Ogilvie, and which showed the amounts received for rents, and on notes, sales or otherwise; also a book in which he

had taken copies of all receipts given by him for monies collected or received, and showing on what account each sum of money had been paid to him; and, in addition, he used to produce or had in readiness to exhibit all vouchers which could be asked for, to show his accounts correct. Thus prepared, the parties used to sit down together, Mrs. Ogilvie would cursorily examine the accounts, and look into the books; Mr. Belden would explain such items to her as appeared to require it; and then, she seeming to be satisfied, he would pay her the balance as stated, and for which she would sign a receipt, and, at the same time, acknowledge the account to be settled. In all these transactions, the greatest friendship prevailed; and the lady reposed in her agent the most unlimited confidence. She was of a mild and easy disposition, had a naturally good capacity, was well educated, and independent in her circumstances; living in her own house, at an expense of about four thousand dollars a year, and superintending the disbursements relating to her establishment. Until within a year previous to her death, Mrs. Ogilvie was able to look into accounts, and had capacity sufficient to understand them, provided she applied her mind to the subject, and to understand the nature and effect of receipts: but, from her habits of life and disposition, she did not apply herself to such matters or bestow upon them the attention necessary to detect errors in an intricate account. It was only during the two last years of her life, while laboring under infirmity incident to age, that she employed a house keeper. The illness, of which she died, was of short duration. Her son, Captain Philips, re sided with her. There were several relatives, and intimate friends, men of high character, intelligent and of business habits, who frequently visited her; but she never called upon any of them to assist in examining or settling accounts or in any matters of business. She was in the habit of relying entirely upon the integrity of those she employed or with whom she dealt. In Mr. Belden she had the most implicit confidence; and would sign papers which he handed to her, without scrutinizing or examining the same in order to ascertain whether they were correct or proper.

The same kind of confidence, and to a like extent, was felt

on the part of Captain Philips, in Mr. Belden, and the like friendship subsisted between them.   He had received a liberal education, was a Captain in the British army, and had been in active service during the revolutionary war.   He retired at the close of it, and received his half pay for life. He lived as a gentleman, was fond of ease, spent his cash freely, and was thoughtless and indifferent about money concerns.   But he was, nevertheless, intelligent, possessing more than ordinary talents, was capable of understanding and settling accounts and transacting business, and frequently gave directions, and attended personally to his affairs. And yet, his habits of life had produced in his mind an aversion to any business which required application, as, for instance, the investigation of accounts ; and this aversion disqualified him, in a great measure, from sitting down and applying himself to such subjects.   Hence, his practice was, to glance at accounts, when presented ; and to pay them without much examination.   He trusted to the integrity of others ; and kept no books of accounts of any consequence. Mr. Belden's method of making out and submitting his accounts to Captain Philips for settlement, and of producing his books and vouchers, and the manner of examining them, when together, and the coming to a settlement, were in all respects similar to the course pursued with Mrs. Ogilvie.   In this way opportunities were afforded, both to Mrs. Ogilvie and Captain Philips, for investigating the correctness of the agent's accounts, and detecting errors, if any existed.   But neither of them ever went into a minute examination of the accounts.

Mr. *J. Duer* and Mr. *J. Blunt* argued for the complainants, on the following points :

### (As to Mrs. OGILVIE's Accounts.)

1. That there was no such settlement of accounts between Margaret Ogilvie and Amos Belden in the bill mentioned, as ought to be a bar to the account now sought.

2. That the accounts with Mrs. Ogilvie, as exhibited, con-

tain errors and extravagant charges; and, on that ground, ought to be opened.

3. That lapse of time does not apply as an objection until after the confidential relation subsisting between the parties, and the influence growing out of the same, had ceased.

4. That the said Amos Belden has so connected and blended his account of Mrs. Ogilvie's estate, with his accounts of Captain Philips' estate, that the latter account cannot be correctly settled, without the former be first revised and adjusted.

### (*As to Captain* PHILIPS' *Accounts.*)

1. The first three points above taken, are also here taken as applicable to the accounts between Captain Philips and Amos Belden, as his agent, as in the bill in this cause mentioned.

2. That, supposing there had been such a settlement of accounts between Capt. Philips and Amos Belden, as would *prima facie* be a bar to opening the same, yet that there is evidence of such Breaches of Trust on the part of Amos Belden, as Agent of Capt. Philips, as to render it the duty of this Court to open the whole of the said accounts.

3. That the sale of the Farm and advance to Joseph Hopkins by Amos Belden, as in the Bill mentioned, and the securing his own debt thereby against Hopkins, were gross Breaches of Trust, for the loss resulting from which the Estate of Amos Belden is in equity responsible.

4. That the canceling of the bond and mortgage of Stephen Swift, by the said Amos Belden, as set forth in the Bill, is not explained or justified by the evidence or pleadings; and that the Defendants are responsible for the loss thereon.

5. That the charging of compound interest, by the said Amos Belden, upon the notes and securities obtained by him from the said Capt. Philips, and alledged to be due, and the payments thereof, as obtained by him from Captain Philips, were also breaches of trust, which can only be corrected by opening the accounts between them.

6. That, in any view of the case, the complainants are entitled to a decree fot a reference of the accounts between the

said Margaret Ogilvie and Amos Belden, and the accounts between Captain Philips and Amos Belden, to a Master, with liberty to the complainants to surcharge and falsify.

7. That the notes obtained from Capt. Philips by Amos Belden, ought not to be allowed, without proof of consideration. That the purchase of the Farm by Amos Belden, from Captain Philips, as stated in the pleadings, was, under the circumstances, absolutely void; and that the complainants are entitled to a re-conveyance thereof.

*Mr. Gerard*, and *Mr. S. A. Foote*, based their arguments upon these points:

I. The accounts with Mrs. Ogilvie are stated and settled accounts:
1. On account of the receipts and settlements.
2. Because the accounts were settled in the mode agreed upon by the parties.
3. On account of the lapse of time in which they have been acquiesced.

II. No fraud in settling them is shown; and nothing short of that can open them.

III. The accounts with Captain Philips are settled and stated accounts:
1. On account of the receipts and settlements.
2. Because the accounts were settled in the mode agreed upon by the parties.
3. On account of the lapse of time in which they have been acquiesed.

IV. No fraud in settling them is shewn; and nothing short of that can open them.

V. The allegations in the Bill as to the Belden farm, are unfounded.

VI. If true, they afford no reason for opening the accounts.

VII. The allegations in the Bill, as to the Hopkins farm, are unfounded.

VIII. If true, they afford no reason for opening the accounts.

IX. Any mistakes or inaccuracies pointed out in the accounts, afford no reason for opening them, beyond rectifying such mistakes or inaccuracies.

X. The Defendants are entitled to the commission of five per cent. on the sales not charged in the settled accounts; and a reference must be ordered to a Master to ascertain the amount of sales on which that commission is to be charged and the amount of the note for two hundred and fifty pounds, on the settlement in November 1826, now held by the Defendants.

XI. The Swift bond and mortgage was paid by Mr. Belden to Captain Philips, at the time it was cancelled; and it was not a subject to go into his agency accounts, or for which, in the ordinary course of business, he would take a voucher.

THE VICE-CHANCELLOR.—Under the circumstances detailed in this case, it is insisted, on the part of the complainants, that even supposing there was no actual or intentional fraud practiced by the agent in obtaining the settlements, yet they ought not to stand and are still to be deemed open accounts; and, especially, that where such a confidential relationship exists as is proved in the present case, the policy of the law is against considering accounts as closed and settled, unless the party setting up the defence proves affirmatively the correctness of them. As a general rule, where an account is made up and rendered in due form, he to whom it is rendered is bound to examine the same or to procure some one to examine it for him; and if he admits the account to be correct, it becomes a stated account and is binding upon both parties,—the balance being the debt, which may be sued for and recovered at law upon the basis of an *insimul computassent.* So, if instead of an express admission of the correctness of

*7th Oct.*

the account, the party receiving it keeps the same by him, and makes no objection within a reasonable time, he will be considered, from his silence, as acquiescing, and be equally bound by it as a stated account. And whenever the balance appearing to be due by such stated account is paid, it then becomes a settled account. This is the result of the agreement and acquiescence of the parties in the correctness of the accounts, and of their concurrent acts—the one in paying, and the other in receiving the balance. If either party attempts to impeach the settlement and to open the accounts for re-examination, either wholly or in part—and which can only be done on the grounds of fraud, mistake or error—the burthen of proof rests upon the party impeaching, and he must prove the fraud or point out the error or mistake on which he relies. These are the plain and familiar rules which govern in ordinary cases. Are the circumstances here presented sufficient to justify a departure from them?

The aversion of Mrs. Ogilvie and Captain Philips to examine accounts, and their reluctance to look into them minutely for the purpose of satisfying themselves, instead of relying altogether upon the "blind confidence," as it has been termed, in their agent, is not to be imputable to the defendant —nor was it caused by his means. It arose from their own inert dispositions and the habits they had formed. It was not Mr. Belden's fault if they did not choose to examine for themselves or employ others sufficiently skilled in accounts to attend to examinations and settlements on their behalf. They should have done one or other of these things, unless they were perfectly satisfied to forego the privilege. If they preferred the latter, they ought not now to complain. The agent rendered his accounts periodically, exhibited his books and vouchers, invited an investigation preparatory to a settlement, and afforded time and opportunity for it at the party's own house and where they could have had any assistance they might have desired. This was all which the accounting party had to do. His conduct, on these occasions, as to the manner of proposing and effecting the settlements, for aught that appears, was upright, fair and honorable. They were willing to admit his accounts as presented; and they settled with him accordingly.

But their incapacity to understand long and complicated accounts, is urged as a reason against the settlements. Here, again, was a fault of their own. It is not one which can be attributable in any way to the agent. They were not persons labouring under such weakness of intellect or imbecility of mind, as to disqualify them from managing their affairs in general, and to render it improper for other persons to deal or make contracts with them:—far from it: they merely were not accountants. In this consisted their deficiency—a deficiency which they should have remedied by application to the subject of accounts or supplied by calling in the skill of others. Their omission or neglect in this particular ought not to be the foundation of an objection on their part to the settlements which they thought proper to make, without taking pains to investigate for themselves, (if such was the fact) or employ others to do it for them. Even as respects Mrs. Ogilvie in the two last years of her life, when old age had brought on bodily infirmity, her mind remained sound, and she could have availed herself of the assistance of friends to examine accounts presented by her agent. And, besides, her son, Captain Philips, residing in the same house, must have known when the agent was there with his accounts for settlement; and if, during this period, his mother stood in need of assistance, he was at hand, to assist or procure aid for her. The objection on this ground, therefore, fails.

The next objection is founded upon the circumstance of unlimited confidence, and the relation which the nature of the agency created between them. The policy of the law is strongly against permitting certain classes of transactions to stand, which have been entered into, where a confidential relationship exists between the parties, without allowing an inquiry. It looks upon them with a jealous eye: because there is room to suppose the party, claiming the benefit of the transaction, may have availed himself of knowledge acquired from his situation as agent or trustee, or exerted an improper influence which such situation has given him, or, possibly taken some advantage of the confidence he enjoyed, and turned it to his own account: —in other words, that the parties have not dealt upon equal terms. In such cases, this court will, in general, interfere

and institute an inquiry into the transactions, without direct evidence of fraud or imposition, and will put the parties back to where they stood in reference to the subject matter of the agreement before they entered upon it.

But, the present is not a case falling within this rule of policy; and none of the numerous cases to which I have been referred extend the doctrine to a settled account between principal and agent, where there has been an actual accounting, even although there may have been confidence and trust.

In the recent case of *Jenkins* v. *Gould*, 3. Russ. Rep. 385., a settlement, in relation to the defendant's accounts, as the plaintiff's solicitor, receiver and manager of his estates, was set aside.    But there, the defendant had never delivered any bill of his costs as solicitor ; and had never rendered or prepared any account of his receipts and payments as receiver and manager.    Also, while standing in this confidential situation, he had obtained from the plaintiff a mortgage of his estates as security for the balance of his accounts.    And without ascertaining, by any examination or even production of his accounts or vouchers, what the balance really was, (the defendant insisting that a large balance was due to him,) he obtained from an agent of the plaintiff's, who was empowered to settle and compromise with him, an agreement by which the plaintiff should pay him a gross sum, in full, and this was to be a final settlement between them.    The Court held, considering their relative situation of solicitor and client, agent and principal, and on account of the duty of the former to keep regular accounts and render them in due form, that he should not avail himself of his own neglect or omission of duty ; and decreed the accounts to be investigated.    The present case is widely different ; because accounts were rendered.    The same marked distinction will be found to exist in regard to other cases.    Thus in *Middleditch* v. *Sharland*, 5. Ves. 87, a receipt in full was set aside, and an account directed.    The decision went upon this ground, amongst others, that the defendant did not, at the time of obtaining the receipt or at any other time, deliver any regular account in writing to his employers.    The Master of the Rolls observed : " The nature of the defendant's employment, which was that of a land steward, imposed up-

on him the duty of keeping accounts; and the circumstances which he disclosed by his answer were not sufficient to excuse him, as steward, for the monstrous negligence in keeping no account whatever. Therefore, for the sake of the precedent, he was bound to order an account of all the dealings and transactions; and decreed the receipt should not serve any further than as evidence of so much money paid. So, in *Salkeld* v. *Vernon*, 1. Eden, 65, a bill was filed by a residuary legatee against executors, for an account. A release was set up, but the Lord Keeper put it aside and decreed an account, mainly upon the ground that the release had been obtained without an account from the executors of the personal estate. He deemed it a necessary ingredient to support such a release that an account should be rendered. On the other hand, *Davies* v. *Spurling*, 1. Tam. R. 199, & *S. C.* 1 Russ. & M. 64, is an authority to show, if an authority were necessary, that where accounts have been rendered by an Executor, Agent or Trustee, and, after being examined, the same are admitted to be correct and an acknowledgment to this effect is signed and the balance paid, such a settlement will not be disturbed, nor the accounts ordered to be retaken under the direction of the Court, unless for fraud or surprise in the settlement clearly proved or so far as errors in the accounts can be pointed out.

There is a numerous class of cases in the books, where, it is true, the Court of Chancery has gone pretty far in opening accounts, upon the ground of settlements having been made during the existence of a confidential relationship. These are between Attorney and Client, or Solicitor and Client. Still, in all the cases of this description to which I have been referred, or which have fallen under my observation, in addition to professional confidence, as a ground for interference, there has existed special circumstances, showing fraud and imposition practised upon the client, or an undue use made of the power and influence which the relation of Attorney and Client has given the former over the latter, and of which he had taken an unconscientious advantage. The cases of *Wharton* v. *May*, 5. *Ves.* 27. and *Vaughan* v. *Lloyd*, before Lord Thurlow, there cited, *Purcell* v. *Mc Namara*, 14. *Ves.* 91., *Lewis* v. *Morgan*, 5. Price, 42. *S. C.* 4.

3

Dow, 29. and 3, Young and Jervis 230, and *Jenkins* v. *Gould,*
*ut supra,* are all instances of this sort.   Even if the Court
should be called upon, in a case between Solicitor and Client,
to set aside a release and to open accounts, in the absence
of any thing like fraud, I apprehend it would be for rea-
sons of public policy and upon principles peculiar to such
cases; and which do not apply as between principal and
agent, manager and steward disconnected with professional
calling or the character of a legal adviser: 5 Price 43 *n.* &
55.   On this topic it is unnecessary to enlarge.

I am convinced there is no good reason why accounts,
which have been settled in a case of a stewardship or agency
like the present, should be opened and the agent or his repre-
sentatives be subjected to a new accounting under the direc-
tion of the Court, merely because, at the time of the settle-
ments, the agent possessed the unbounded confidence of his
principal.   On this ground the Court cannot interfere. If the
accounts are to be opened at all, it must be for other reasons
and upon more substantial grounds.

This brings me to the consideration of the alleged frauds,
overcharges, mistakes and errors, and the effect which
these, when ascertained, are to have upon the settlements.

As respects fraud in the settlement of Mrs. Ogilvie's ac-
counts, none, indeed, appears.   An objection is taken to the
manner of stating some of the accounts; because the credit
side contains only a sum in gross, without a detail of items.
It is also made a point that the Agent did not keep and fur-
nish rent rolls and other proper statements of property and
income; and has not been sufficiently distinct in his accounts
as to what belonged to Mrs. Ogilvie and what to Captain
Philips.   All these matters, even as shown, are far from be-
ing evidence of fraud; nor does any loss or injury appear to
have resulted to the principals, from such keeping and render-
ing of accounts.   If they were not so full and explicit as to
be satisfactory to Mrs. Ogilvie, she should have objected at
the time.   After what has taken place, these circumstances
are not enough to warrant the opening of them.

Then, as to what are alleged to be overcharges or errors,
and which are pointed out as grounds for granting leave to
the complainants to surcharge and falsify.   These consist of

two things, namely, charges of five per cent. Commissions on the sales of land for Mrs. Ogilvie, in addition to the stipulated commission of seven and a half per cent., and a charge of interest on three hundred pounds paid to Thomas Belden for a period of three years.

The commissions objected to are found in two accounts, one settled in the year seventeen hundred and ninety-nine, and the other in eighteen hundred and one.   They are charged on certain sums, as being the amount of sales of lands, and are entirely distinct from the other commission of seven and a half per cent. on the amount of collections of Rents and notes.   They formed very conspicuous items in the accounts, so as to have been easily perceived even upon the slightest examination, and are, likewise, so plainly expressed as to be understood by the most ordinary capacity.   Mrs. Ogilvie has signed these accounts as settled; and upon payment of the balances which were in her favour, she gave receipts in full.   In addition to the evidence thus afforded of the correctness of the charges, the defendant is called upon, by the bill, to say, whether his accounts were not overcharged in this respect, and he denies they are, and avers that the five per cent. upon the sale of lands, in addition to the seven and a half for collecting of monies, was authorized and Mrs. Ogilvie knew of it, and he insists upon the same being just, and of its having been allowed by her knowingly.   This is evidence of an agreement on her part to allow the five per cent. as well as the seven and a half per cent. commission.   It stands uncontradicted; and I should not be justified, in the face of the agreement and of her actual allowance of both commissions distinctly presented in the accounts, in permitting the complainants now to falsify the charges.

Then, as respects the interest money of twenty-one pounds a year paid on the debt due to Thomas Belden.   This is charged as having been paid for three years in succession. There is no allegation in the bill, drawing in question the correctness of the accounts in this particular; and, of course, there is nothing in the answer relating particularly to the subject.   On the hearing, it was, for the first time, suggested to be an error or a charge in the accounts which the defen-

dant ought not to have made, because, as the Counsel said, it appeared, from the accounts themselves, that the defendant had balances in his hands sufficient to have paid the debt and ought to have paid it, and stopped the interest; or, if he permitted the interest to accrue against Mrs. Ogilvie, he should have allowed her interest on the balances in his hands. I am not satisfied that, in point of fact, monies belonging to Mrs. Ogilvie remained in the defendant's hands any length of time. He was in the habit of paying her over sums from time to time as the money came in and whenever convenient opportunities offered to send it to her, obtaining her receipts for such payment on account, and then, at reasonable intervals, making the settlements before spoken of and paying her the balance,—the accounts being made up of his collections at different periods on the one hand, and his disbursements and payments on the other. In running accounts of this sort, it may well be, and doubtless often was the case, that he had but small amounts remaining in his hands for any length of time. Hence, it may be unjust to charge him with interest or to impute negligence to him in not paying off the debt due to Thomas Belden. Besides, it is said, and I think truly, the defendant was not bound, without the express direction or authority of Mrs. Ogilvie, to apply the funds in his hands to the payment of her debts, and he is not to be charged with a breach of duty in this respect until the complainants shew she gave him such authority or direction. And as he paid the interest and charged the same in his accounts, and which she has allowed and settled as being correct, the presumption is that his authority extended no further and that it suited her convenience to let the principal remain a few years unpaid. For these reasons, I cannot but think this last ground, upon which it is urged that the complainants ought to be let in to surcharge and falsify, is likewise not sustained,·

Upon the whole, in regard to the accounts with Mrs. Ogilvie, even if the grounds assumed were such as could be deemed sufficient, under other circumstances, to let the complainants in to a partial scrutiny of the accounts or to require the defendant to submit to an entirely new accounting, as if no settlements had ever taken place, still, under present

circumstances, the Court ought not and cannot with any degree of propriety interfere.

It is a wise and salutary provision of the law, which permits time to draw a veil over the transactions of men; and equity, acting upon this benign principle, gives great effect to the lapse of time, and discourages claims not promptly made, especially where there has been no personal disability or other impediment in the way of asserting them. Here has been none; and yet, from the time of Mrs. Ogilvie's death (when all her rights devolved upon her son), a period of twenty years or thereabouts has been suffered to elapse, without objection to any part of the accounts and without the least intimation or assertion of claim arising upon them. If this long acquiescence is not an absolute bar, it is, at least, a circumstance to require at this day much clearer proof for opening and re-investigating the accounts than is at present furnished: *Hampson on Trustees;* 99.; *Ellison* v. *Moffat,* 1 John. Ch. Rep. 46.; *Rayner* v. *Pearsall,* 3. *Ib.* 578.

My conclusion on this part of the case is that Mrs. Ogilvie's accounts must stand as settled accounts; and that the complainants have not shown enough to entitle them to surcharge and falsify, especially at this late day.

I now proceed to the account with Captain Philips. For the reasons already given against opening the settlements made with Mrs. Ogilvie, on the ground of the confidential relationship and the slight examination of the accounts when presented, it is manifest the settlements with him, as acknowledged under his hand, should not be set aside. The same principles apply and the reasons are still stronger against him why the accounts should not be opened upon these grounds. Nor do I think there is any thing which can possibly be construed into fraud on the part of Mr. Belden, in the mode of keeping and rendering his accounts or in the manner of settling them with Captain Philips, so as to require the interference of the Court to the full extent of subjecting Mr. Belden or his representatives to an entirely new accounting. I shall, therefore, leave these accounts likewise to stand and to be treated as settled accounts between Captain Philips and Mr. Belden.

But there are sufficient reasons why the complainants

should have liberty to surcharge and falsify them to a certain extent. Although the scope and object of the bill is for a general account as if no settlement had ever taken place between the parties, yet, it is so framed that, upon the defendant's setting up and proving stated accounts so as to protect himself from a general accounting, the complainants may nevertheless be entitled to an inquiry into the accounts as stated and settled for the purpose of shewing errors and omissions. The Bill charges a variety of errors and omissions; and upon which the parties are at issue. The state of the pleadings, therefore, admits of the introduction of proofs on these points. In such a case, and where enough appears to induce a belief of errors having occurred and that the accounts require to be corrected, it is the duty of the Court to permit it to be done, by giving leave to surcharge and falsify: *Brownell* v. *Brownell*, 2 Bro. C. C. 62; *Taylor* v. *Haylin*, Ib. 310. and *S. C.* 1, Cox, 435; *Johnson* v. *Curtis*, 3 Bro. C. C. 266; *Kinsman* v. *Barker*, 14 Ves. 579.; and see 9 Vesey, 266.

Among the alleged overcharges and errors in the accounts between Mr. Belden and Captain Philips, there is one of compound interest upon certain notes given by the latter to the former. Such an error, I am inclined to think, will be found to exist; and, if so, it should be corrected: unless allowing it to stand can be justified by the rule laid down in *The State of Connecticut* v. *Jackson*, 1 *John. Ch. Rep.* 13, and *Van Benschooten* v. *Lawson*, 6. *Ib.* 313. This forms a proper subject of inquiry for a Master. So, in regard to the alleged omission in the accounts of the money arising from Swift's Bond and Mortgage. Mr. Belden appears to have been in a state of uncertainty as to whether he had ever credited this money in his accounts or paid it over to Captain Philips. This circumstance affords another reason for permitting the accounts to be examined; and, to be corrected by the Master, if he shall find the money has not been credited or paid to Captain Philips. Mr. Belden has, moreover, in some of the Schedules annexed to his answer, pointed out errors and omissions which he has himself discovered, and which must, necessarily, require investigation in a Master's Office; and he also claims to charge a certain commission,

omitted in his accounts, which he insists he is now entitled to demand.

I mention these alleged omissions, errors and overcharges, in order to show the propriety of permitting an investigation, so far as they are specially pointed out in the pleadings. Either party may have liberty to surcharge and falsify; but in so doing, they must confine themselves to such matters as they have expressly and specially alleged to be overcharges, errors or omissions. I shall not permit them to go further. It is desirable to limit, as much as possible, the subjects of inquiry in the Master's Office. In order to understand clearly the application of the terms "surcharge" and "falsify," and the difference between this course and taking an account generally, it is well to observe that where liberty is given to surcharge and falsify, the Court takes the account to be a stated and settled account and establishes it as such. If either party can show an omission, for which an entry of debit or credit ought to' be made, such party surcharges, that is, adds to the account, and if any thing should be inserted which is wrong, he is at liberty to show it, and this is a falsification. The *onus probandi* is always on the party making the surcharge or falsification; and if he fails to prove it, the account must stand as correct. It is presumed to be correct, after having been once settled, until the contrary appears. Here lies the difference between this and a general accounting: for, in the latter, the party producing the account must shew the items to be correct: 1 Mad. Chan. Prac. 83.

There are some points about the accounts to come before the Master which call for the opinion of the Court; and which it is right should be so settled by way of special directions on the reference. The facts of this case are as fully before the Court as they are ever likely to be; and a full opinion now may be the means of preventing exceptions and further discussion. The first point is in relation to the Hopkins' farm. The accounts of Mr. Belden with Captain Philips contain an item of debit, under the date of the eighteenth day of February one thousand eight hundred and fifteen of four hundred and seventy eight pounds, as sundries paid to Joseph Hopkins and secured by his bond and mortgage to

Captain Philips. This sum, equal to eleven hundred and ninety five dollars, is composed of five hundred dollars advanced by Mr. Belden on Captain Philips' account to one Joseph Hopkins and of six hundred and ninety-five dollars of debt due by Hopkins to the defendant in his own right. These sums were included in and formed part of the consideration, of a bond and mortgage executed by Hopkins to Captain Philips through the agency of Mr. Belden for four thousand four hundred and sixty-five dollars on the eighteenth day of February one thousand eight hundred and fifteen upon a farm of one hundred and eighty acres at that time conveyed by Captain Philips to Hopkins, and on which he had resided as tenant for many years. The other parts of the consideration for the bond and mortgage were made up of the whole purchase money of the farm at the appraisal of ten dollars per acre in the year one thousand eight hundred and ten with interest upon it from that period and other indebtedness which Hopkins was under to Captain Philips for rent of the farm. In order to reimburse Mr. Belden in part for the five hundred dollars advanced and to pay the debt owing to him by Hopkins (which was included in the bond and mortgage) Mr. Belden appropriated to his own use a bond of one William Calkins to Captain Philips for three hundred and seventy-one pounds and eighteen shillings which was in his hands as agent and which he accordingly gave credit for in his account of the same date with the charge of four hundred and seventy-eight pounds. The complainants ask leave to falsify as to the whole of this sum, upon the ground that the advance of five hundred dollars to Hopkins was improvidently made and the giving of a deed to Hopkins and taking back a mortgage was, under the circumstances, a mere contrivance of the agent's to obtain payment of his debt, which Hopkins, who was an old man and insolvent, was unable to pay, and that it was making Captain Philips assume a debt without adequate security—the original purchase money of the farm with interest and the prior indebtedness to Captain Philips being as much or more than the farm was worth—and that the consequence has been a loss to Captain Philips of several thousand dollars. And the complainants counsel say, he, Captain Philips, was drawn into and assented to the arrange-

ment from a blind credulity and misplaced confidence, against which the agent was bound to protect him: and, consequently, the loss of this money should be borne by the agent. I have carefully looked into this transaction, as set out in the bill and answer, and have examined all the testimony brought to bear upon it, and after the most deliberate consideration, I am of opinion Captain Philips is bound by the assent which he appears to have freely given to the sale of the farm to Hopkins and to the advance of the five hundred dollars towards paying his debts, as an inducement to him to purchase. The testimony of Mrs. Philips and George Belden go far to show that Captain Philips himself agreed with Hopkins to make the advance; and I am inclined to think this is the truth of the case, whatever Hopkins may say to the contrary. His extreme age and loss of memory easily accounts for the discrepancy. But I am not convinced and the evidence certainly fails to prove that Captain Philips ever agreed to assume or take upon himself the absolute payment of Hopkins' debt to Mr. Belden. He may have known and assented to its being included in the mortgage: but there could have been no sufficient reason or motive for his assuming, at all events, the payment of this debt. If he did do this, it was a gratuitous act; and the value of the farm was certainly not a security equal to the mortgage debt and the interest of one year, which it had to run. Under such circumstances, the defendant should have proved an express agreement, founded upon a consideration of assuming and running the risk of payment: because it is, in effect, an undertaking to pay the debt of another. The mere including it in the mortgage security is not sufficient, unless the security proved available to the full extent of satisfying this and the other monies which it was intended to cover. The mortgage has failed of its object in this respect. Although Captain Philips has accepted a release of the equity of redemption or has, by other means, obtained possession of the farm, still it was not in satisfaction of the whole mortgage debt. In point of value, it was insufficient to satisfy his own debt. While the estate of Captain Philips sustains a considerable loss in this respect, it is not equitable or just to throw also upon him the loss of Mr. Belden's debt. It has been sugges-

1833.

PHILIPS
v.
BELDEN.

ted in argument, that Captain Philips, by his subsequent acts, sanctioned and ratified the whole transaction. I do not find, in any of his subsequent acts, the clear and decisive evidence which I think the case calls for, of his having agreed to assume the debt in question and run the risk of its being paid out of the mortgage property or by Hopkins personally. For these reasons, I shall give the complainants leave to falsify the charge of four hundred and seventy-eight pounds to the extent of six hundred and ninety-five dollars, but not as to the five hundred dollars residue; and it will be the Master's duty to correct the accounts accordingly.

The next and only remaining point in controversy which it is necessary for me to notice, is the Belden farm. This is the farm on which Mr. Belden resided as tenant for several years and then purchased at an appraised value. The professed object of the bill is to set aside the sale and to have a reconveyance of the property with a full account of rents and profits, with an enquiry as to the consideration money paid for the same. But the complainant's counsel have waived the claim to a re-conveyance and insist upon the right of inquiring into the consideration of the sale, since it was a sale by the land owner to his steward or agent, alleging the price to have been far below the actual value, and, therefore, the agent is bound to account for a full and fair price for the land, unless he can show he has already done so; and the burthen of proof, it is contended, rests upon the agent. The sale took place in the year one thousand eight hundred and four. The farm consisted of three hundred and sixteen acres and the price was eighteen dollars and fifty cents per acre, amounting to five thousand eight hundred and forty-six dollars. A number of witnesses on both sides have been examined as to the value of the lands at that time; and they differ in their estimates. Some think the price, just mentioned, its full value; while others estimate it to have been worth twenty dollars and some twenty-five dollars an acre. The preponderance of the testimony is not much beyond eighteen dollars and fifty cents an acre. Even admitting the question of value to be an open one at this time, on account of its being a transaction between a steward and his employer (see, *Lord Selsey* v. *Rhoades*, 2. S. &

S. 41.), yet I should not be warranted, at this time of day and under the circumstances, in directing Mr. Belden to be charged with an increased value of the land. There is one circumstance which I think shows very conclusively that all parties must have been perfectly satisfied with the price and the fairness of the transaction and that too after abundant time for reflection had been allowed. About eight years had elapsed when it was discovered that Mrs. Gouverneur was entitled to an estate in remainder in fee in a portion of the land comprised in the farm; and on being applied to by Mr. Belden, she and her husband Mr. Gouverneur (both of whom are here as complainants) executed to the defendant a deed of release and confirmation, without requiring any additional consideration to be paid. This could only have proceeded from a conviction of the fairness of the purchase from Captain Philips and the adequacy of the price agreed upon for the whole title and estate; and their opportunities of ascertaining and determining this point were certainly as good in the year one thousand eight hundred and twelve (when such release was given) as in one thousand eight hundred and twenty-nine, when the contrary was, for the first time, suggested. I am of opinion the price fixed upon and allowed for the purchase of this farm ought not to be disturbed. As respects the payment of the purchase money, a considerable portion of it appears to have been paid by turning-in notes, accounts and balances which were claimed to be due from Captain Philips to Mr. Belden. So far as these have entered into or grown out of the general accounts between the parties, any errors or overcharges will be reached and rectified by the leave to falsify, provided they are embraced within any of the objections to the accounts pointed out by the bill. Nothing further is necessary to be observed on this subject.

A decree must be entered adjudging the accounts to be settled accounts, and allowing them so to stand. But, in regard to the accounts with Captain Philips, leave is to be given to the parties respectively to surcharge and falsify to the extent and upon the principles already stated, with special directions upon the points I have noticed and endeavoured to settle.