MURRAY & MURRAY *against* TOLAND & MEADE.

*M.* and *T.* being owners, in certain proportions, of goods lying at *Cadiz, M.* consigned the whole to *T.*, of *P.*, for sale, on their joint account, according to their respective interests; and *T.* put the goods, with the invoice and bill of lading, into the hands of *B.* and *C.*, partners in trade here, to sell. *Held,* that *B.* and *C.* could not retain the proceeds in their hands, to satisfy a demand of *B.* against *M.* That *T.*, as part owner, and as factor and agent of *M.*, the other part owner, might maintain an action, in his own name against *B.* and *C.* for the proceeds; and that the defendants could not *set off* against the plaintiff, the separate demand of *B.* against *M.*, especially, when that demand was for damages arising from the alleged negligence and misconduct of *M.*, which were the proper subject of a distinct suit, and of *legal*, not of equity jurisdiction.

That *B.* and *C.* having received the goods for sale, as agents of *T.*, with full knowledge of his rights, and of the capacity in which he acted, and without giving him notice, at the time, of the claim of *B.* against *M.*, were not entitled to the aid of this court in their defence of the suit of *T.* against them at law.

Where the supercargo and agent of a merchant here, delivers goods to a merchant abroad for sale, and the agent settles with the merchant abroad, according to the account stated by him, with full knowledge of all the facts, without any fraud or imposition, the principal here is bound by the act of his agent, and is concluded from any further claims against the merchant abroad, especially after having kept the account for several years, without making any objections to it.

IN *February*, 1813, the defendants, *Henry Toland,* jun. of *Philadelphia,* and *Richard W. Meade,* an *American* citizen, residing at *Cadiz,* were joint owners of 500 pieces of block tin, 236 pieces belonging to *T.*, and 264 pieces to *M.*, then lying in *Cadiz. W. L. Hodge,* agent of *T.* at *Cadiz,* and supercargo of the ship *William,* agreed with *M.* to ship the tin on board the *William,* consigned to *T.*, and the tin was accordingly shipped, and the invoice and bill of lading expressed, that it was consigned to *T.* of *Philadelphia,* for the account and risk of *M. & T.* in their respective proportions, above stated. The ship with the tin arrived at *New-York,* the 27th of *March,* 1813, and *T.* sent to the plaintiffs, *John B. Murray & James B. Murray,* partners in trade there, the bill of lading and invoice of the tin, with instructions to sell it. On the 20th of *May,* 1813,

*October 1st and 2d, and November 13th.*

1818.

MURRAY
v.
TOLAND.

*John B. M.* informed *T.* verbally, that *M.* was greatly in-debted to him, *John B. M.*, and that he should retain the proceeds of the tin, in part satisfaction of his claim; and by letters of the 31st of *May*, and 4th of *June*, 1813, he informed *T.* that he should retain the proceeds of the tin, to protect him from the violation of a written agreement between him and *M.*, and that a balance of 4,409 dollars and 38 cents, was due on the 17th of *July*, 1810, from *M.* to him.

Soon after the verbal notice given to *T.* on the 20th of *May*, 1813, *T.* informed the plaintiffs, that he had ac-cepted a bill of *M.* on him for 300 dollars; and the plain-tiffs charged, that when the first notice was given to *T.* he had not assumed any responsibilities for *M.*

The bill further stated, that *T.* had brought an action at law in the supreme court against the plaintiffs, as his factors and agents, to recover the proceeds of the tin; and the plaintiffs set forth a particular statement of the claim of *John B. M.*, against *M.*, and prayed for an injunc-tion against the suit at law, and for general relief, &c.

The defendant, in his answer, stated, that when the tin was shipped, *M.*, as his factor and agent, was possessed of a quantity of flour belonging to *T.*, and placed in the hands of *M.* by *H.* for sale, which he sold for 662 dollars, but had rendered no account of sales; and that *M.* had also collected money for freight belonging to *T.*, to the amount of 1,313 dollars, which he had not remitted to *T.*, but claimed to hold the moneys in his hands belonging to *T.*, as a set off against the proceeds of *M.'s* portion of the tin. That *T.* on the 24th of *May*, 1813, paid a draft of *M.* on him, for 300 dollars; and on the 23d of *June*, 1813, he paid a bill of exchange, drawn by *M.*, the 5th of *May*, 1813, for 500 dollars, at 10 days' sight. That these sums were drawn for out of the expected proceeds of the tin.— The defendant did not receive any notice of *John B. M.'s* claim against *M.*, or of his intention to retain the proceeds of the tin, until after the tin was in possession of the plain-

tiffs. That, afterwards, on the 20th of *May*, 1813, *John B. M.* informed him of his having a claim against *M.*, and of his intention to retain the proceeds of the tin, but the defendant did not suppose him to be serious in that intention, until after his letter of the 31st of *May*. That the defendant did not conceive himself justified, by the letters from *J. B. M.*, in refusing to accept the bills of *M.*, drawn upon the faith of the consignment to the defendant; that the plaintiffs offered the defendant no indemnity; that *M.* being informed of these claims of *J. B. M.*, wrote to the defendant, in *September*, that if he allowed the plaintiffs to rob him of the proceeds of the tin consigned to the defendant, he should hold him responsible. The defendant admitted, that he had sued the plaintiffs at law, for the proceeds of the whole tin, and insisted that the plaintiffs, as his *factors*, cannot question his title, but are bound to account to him for the proceeds; and that, at all events, the defendant has a *preferable lien*, to the extent of his claims against *M.* That the defendant knows nothing of the transactions between the plaintiffs and *M.*, and that if *M.* is liable to *John B. M.* for *damages*, for any violation of contract, it is an unliquidated claim, which cannot be legally *set off* against the proceeds of the tin ; and that if *M.* is liable at all, it is to *John B. M.*, *individually*, and not to the plaintiffs.

The defendant *Meade*, in his answer, stated the particulars of the transactions between him and the plaintiffs. It appeared that the claims of *John B. M.* against him, arose out of a consignment of a cargo, on board a vessel, called the *Charleston Packet*, which was under the care of *Samuel Lyle*, who was on board of the ship, and who consigned it to *M.* to be sold for *John B. M.*

It was proved, that *Lyle*, who was the supercargo of the *Charleston Packet*, and had the entire direction and management of it for *John B. M.*, had come to a compromise and settlement with *Meade*, relative to it, on the 28th of

1818.

MURRAY
v.
TOLAND

*October*, 1808, according to an account current, annexed to the answer of *M.*, under which was the following receipt by *Lyle*, dated the 29th of *October*, 1808, "received of *Richard W. Meade*, an order on *Gordon & Co.* for 385 casks of wine, which remain at my disposition, for balance of account current rendered on the 28th instant." *Lyle*, in his deposition, stated, that the account of *M.* of the 28th of *October*, 1808, contained a number of unjust charges, which he specified, and that he was induced, or rather compelled, for reasons mentioned by him, to suffer them to remain in the final account. In the *receipt* given by *Lyle* to *Gordon & Co.*, on the 9th of *January*, 1809, under the *order* of *M.*, for the 385 casks of wine, and 23 casks, in addition, he says, "which wine I have thought prudent to receive, as part payment of a balance of accounts which *M.* ought to have paid me in *June* last, reserving to *John B. M.* his claim for the amount of all losses and damages sustained by him in consequence of my concerns with *R. W. M.*"

*October      1st,*
  *and 2d.*      *Harison*, and *R. Sedgwick*, for the plaintiffs.

          *D. B. Ogden*, and *T. L. Ogden*, for the defendants.

*November 13th.*   The cause stood over for consideration until this day.

          THE CHANCELLOR. The bill was filed to stay the suit at law brought by the present defendant, *Toland*, to recover the proceeds of the goods which he had committed to the plaintiffs to sell.

          1. The first point which arises for discussion is, whether the plaintiffs can retain those proceeds, or any part of them, against *Toland*, in consequence of a demand which one of the plaintiffs advances against *Meade*, who had an interest in those goods.

          The goods belonged to *Meade & Toland*, in nearly equal

proportions, and were sent from *Cadiz*, in *Spain*, by *Meade*, consigned to *Toland*, and the invoice mentioned that they were shipped on account of *Meade & Toland*, in the proportions therein stated. When the goods arrived at *New-York*, the invoice and bill of lading were sent by *Toland* to the plaintiffs, with instructions to sell the goods. The plaintiffs state in their bill, that the goods arrived at *New-York*, on the 27th of *March*, 1813, and that about that time *Toland* sent them the invoice and bill of lading, with instructions to sell, and that on the 20th of *May* following, they informed *Toland* that one of the plaintiffs would retain the proceeds, in part satisfaction of his claim against *Meade*. I presume that the goods were then sold, and the question is, whether a court of equity will aid a claim advanced under these circumstances.

It cannot be denied that *Toland* was entitled to demand and receive those proceeds, and to bring an action at law in his own name. There was a privity of contract between the parties. A factor, according to the case of *Drinkwater* v. *Goodwin*, (*Cowper*, 251.) who receives, and is authorized to sell goods, may bring an action to compel the buyer to pay, and " it would be no defence to the buyer, in that action, to say, that as between him and the *principal*, he ought to have the money." The factor has a lien on the price of the goods in the hands of the buyer, for the balance of his account, and for his acceptances made upon the faith of the consignment.

In this case *Toland* was part owner of the goods, and he held the residue as agent or factor of *Meade*. He dealt with the plaintiffs jointly, as a commercial house, and there was no privity between him and one of the plaintiffs, individually considered. If there could be any set-off allowed in this case, it ought to be of a joint demand of the plaintiffs, and not of the separate demand of one of them. The plaintiffs assumed, and are responsible for those proceeds in their *joint* capacity. This fact is of itself deci-

*Debts set-off against each other must be mutual; that is, they must be due to, and from the same persons, in the same capacity.*

sive against the alleged right to retain. The debt demanded, and the debt to set off, must be mutual, *i. e.* they must be due to and from the same persons, in the same capacity.

But it does not appear to me to be fit, even upon more general grounds, for this court to aid such a defence; and the plaintiffs ought to be left to their defence at law, if any they have. The defendant *Toland* disclosed his rights, and the capacity in which he dealt, when he sent the documents and instructions to the plaintiffs, and the plaintiffs accepted of the agency conferred by *T.* without notice of any dormant claim against *Meade,* and they dealt with him as their principal. This claim was kept concealed for two months, before either of them, even verbally, made any pretension. They accepted of the trust as agents of *Toland,* and good faith requires that they should fully account to him, and to him only. It was for *Toland's* principal to interfere, if he had so chosen, to protect himself against *Toland.* The plaintiffs had no right to put *Toland* aside, against his consent, and to challenge a controversy with his principal. This court ought not to lend its assistance to a proceeding so repugnant to that candor which the parties had a right to require of each other, and to the confidence which was reposed.

2. This ground is quite sufficient to justify a dismissal of the bill, as against *Toland.* But if we go into the examination of the claim set up against *Meade,* there appears to be a decisive objection to it, arising from the settlement made on the 28th of *October,* 1808, between *Meade* and *Lyle,* who acted as the authorized agent of the plaintiff, who advances the claim.

There was an account current stated and admitted, *Lyle* acted upon a full knowledge of all the facts. There is no pretence of any fraud or imposition practised upon him, or that he had not a perfect freedom of action in discussing and settling the account. It was founded upon mutual concessions. If a person will enter, even into a

hard bargain, with his eyes open, observes Lord *Hardwicke* (2 *Atk.* 251.) equity will not relieve him, unless he can show fraud, or some undue means used. At the foot of this stated account, *Lyle* receives and gives a receipt for an order on *Gordon & Co.*, for the balance of the account; and though he afterwards gives a receipt to *Gordon*, in full of the order, as though it was only " part payment of the balance of accounts," yet this being an act of his own, long after the acknowledged settlement, it cannot have any effect upon it. The pretence of coercion, or undue influence, exerted over *Lyle*, is without a shadow of proof. He had applied to the judicial tribunals of *Spain* for relief; and, then, without waiting for any decision, and without any undue cause, he "finally concluded," as he says, to receive from *Meade* the balance as stated, " as a measure of prudence," because *Meade* was considered in insolvent circumstances. There is no evidence of such insolvency existing; and it is most reasonable that the plaintiff, *J. B. M.*, should be bound by the measure of prudence adopted by his agent, especially, as no objection appears to have been made, and transmitted to *Meade*, by the plaintiff, from the date of the settlement in *October*, 1808, to the time he resolved to appropriate the proceeds in question, in *May*, 1813. It has been often held, that if a party receives a stated account from abroad, and keeps it by him for any length of time, (one case says two years,) without objection, he shall be bound by it. (*Willis* v. *Jernegan*, 2 *Atk.* 251. *Tickel* v. *Short*, 2 *Vesey*, 239.) Chancery will not decree an account to be taken after such a lapse of time, but will leave the party to his remedy at law.

3. If this settlement was not in the way, yet the claims of one of the plaintiffs would not be a proper subject of set-off, for they are founded upon the alleged negligence and misconduct of *Meade*, and these are matters of *tort*, sounding in unliquidated damages. Such miscon-

duct is properly to be inquired into, in a distinct suit for that purpose, and so it was decided in *Winchester* v. *Hackley.* (2 *Cranch,* 342.) It is, also, a subject of legal, and not of equity jurisdiction.

Considerable stress was laid by the counsel for the plaintiffs, upon what was said by Lord *Hardwicke,* in *Shish* v. *Foster.* (1 *Vesey,* 86.) The doctrine, in that case, was considered as being applicable to this, because the plaintiffs might have difficulty in obtaining satisfaction from *Meade,* who resides in *Spain,* if the proceeds belonging to him, in this case, were taken out of their hands.

But that case is not analogous. The plaintiff there had filed a bill against his former guardian, to set aside a stated account, on the ground of fraud; and the defendant filed a cross bill for the specific performance of an agreement for an estate in possession of the plaintiff. The Chancellor suspended the decree for a specific performance, until the account was taken, as the plaintiff would have been in danger of losing his demand, if the estate had been taken from him, for the defendant had frequently absconded. The cross bill, in that case, was for equitable aid; and under the circumstances of the case, the court applied the rule, that he who would have equity must do it. Whether the rule was properly applied in that case, is at present immaterial, for it is a sufficient objection to the application of the case, that *Meade* is not now a plaintiff before this court asking for relief.

But Lord *Hardwicke,* in delivering his opinion, cited the case of " *Jacobson* v. *Hans Towns,* or merchants of *Almaign.*" From the imperfect note which he gives of the case, it would appear, that *Jacobson* had been a lessee of an estate belonging to the defendants, and the lease having expired, an ejectment had been brought against him at law to recover possession. He filed a bill in Chancery, on the ground, that he was a creditor in a long account, and that the estate ought not to be taken from

him, until he had received satisfaction of his demand. And though he had no real lien on the estate, an injunction was granted by Lord *Macclesfield*, and continued by Lord *King*, because of " the difficulty of his getting satisfaction, if the estate was taken from him, as they (the defendants) were a corporation residing beyond sea."

This case requires every kind of explanation, and I am not willing to consider it as an authority, as it now stands. It is not to be found elsewhere; it is contrary to the principles of the court, which measures out the same justice to foreigners and citizens; and it is contrary to the established doctrine in respect to set-offs. It is altogether new, that an unsettled account can be set off against an ejectment to recover possession of land, to which the lessor, in the ejectment, has an undoubted title. The only case in which an ejectment has been stayed, until an account was taken, is the case of an ejectment for non-payment of rent, and where the dealings between the landlord and tenant were too complicated for law. The interference of the court, in that special case, was requisite to determine whether there was any foundation for the ejectment. (*O'Connor* v. *Spaight*, 1 *Sch. & Lef.* 305.) But to enjoin a party residing out of the jurisdiction of the court, from covering possession of land to which he has a title, because the tenant in possession has some personal demand against him totally unconnected with a right to the land, would be extraordinary. The ground taken in the case stated, was, that it would be inconvenient or difficult for the tenant to obtain his demand from the party residing abroad. Is the court, then, to hold the land, by way of mortgage, for an uncertain demand sounding in contract or tort, when the parties have created no such lien? I cannot venture to act upon such a case without more authority. If that was the law or usage of the court, we should have had better evidence of it than this obscure and solitary allusion to the case of *Jacobson* v. *Hans*

*Towns.* Such a principle would check all suits at law, and extend the doctrine of set-off to every possible case, if it so happened that the plaintiff at law was not within the jurisdisction of the court. The inconvenience of following a party to his place of residence abroad, does not appear to me to be, of itself, a sufficient ground for departing from the settled doctrines of the court. The court cannot be governed by the mere question of comparative convenience. What would be proper, if the party resided in a country where there was no regular law or justice, or where he was absolutely inaccessible, is not a point before me. A residence at *Cadiz* is, surely, not such a case ; nor is *Spain*, with all her infirmity, to be put out of the pale of civilized nations.

I shall not enter into the discussion of the charge of misconduct in *Meade*, and which occupies so large a part of the pleadings and proofs in this case. Either of the three grounds I have taken are sufficient to destroy the equity of the bill as against *Toland*, and the two last of them, as against *Meade*.

The injunction must, accordingly, be dissolved, and the bill dismissed, with costs.

Decree accordingly.