## LANGDON, et al. v. ROANE'S ADM'R.

1. Where the parties have settled their accounts and struck a balance, which has been adjusted by cash, or with a security for its payment at a future day, it is incumbent upon the party complaining of fraud or mistake, by suit in chancery, to allege it specially in his bill, and to establish the allegation by proof ; and the agreement by the parties that errors should be corrected, does not relieve the complainant from the *onus* of proving a mistake.

2. If a party to whom an account is rendered, admits its correctness, it becomes a *stated account;* or if he retains it and makes no objection within a reasonable time, his silence will be construed into an acquiescence in its justness, and he will be bound by it, as if it was a *stated account.*

3. *Semble:* That the enforcement of a contract may be prevented, by showing a fraud on the part of him who seeks to derive a benefit from it, unless the fraud has been assented to, or acquiesced in ; but a party cannot as the actor in a suit in equity, avoid a security which he has given for a debt clearly due, because he was induced to give it by the false representations of the creditor, made in ignorance of the facts, rather than from a settled purpose to deceive.

4. The complainant is not entitled to relief upon proof, to the admission of which there is no allegation adapted.

5. *Semble :* Where the complainant could obtain the relief to which he is entitled, without a resort to equity, the defendant will not be taxed with costs.

WRIT of error to the Court of Chancery, sitting for Greene county.

The intestate of the defendant in error exhibited his bill against the plaintiffs on the 8th January, 1839, in which it is alleged, that Messrs. Lea & Langdon, two of the defendants, were commission merchants for the complainant from August, 1835, to the spring of 1838—bought his supplies in Mobile, advanced money for him, and sold his cotton there. On the 10th November, 1836, L. & L. presented their account to the complainant, which amounted, after an allowance of all credits, to the sum of three thousand two hundred and sixty-eight 79-100 dollars; confiding in their integrity, he gave his note for that sum, at sixty days after date, negotiable at the Branch of the Bank of the State of Alabama at Mobile. Upon a more particular examination of the account, the complainant has discovered several errors, viz: a charge of $124 77-100 for bacon purchased for him on the 20th June, 1836, with interest and commissions thereon. This item, L. & L. have since admitted to be incorrect. There is a further mistake of three or four dollars, for compound interest charged.

The complainant states, that he sent to Messrs. Lea & Langdon his crop of cotton for 1836, making thirty-nine bales, averaging four hundred and fifty pounds each, although they have only furnished him an account of sales for twenty-four bales. The nett proceeds of twenty, sold in Mobile, amounted to $1238 67-100; and the proceeds of four sold in Liverpool, were $261 46-100. L. & L. admitted they had sold five bales of Cotton in Liverpool, but no account has been rendered, excepted as above stated; if the other fifteen sold as well as those accounted for, then L. & L. have been fully paid off. The note, given on the 10th November, 1836, has been taken up by the complainant, and he has it in his possession ready to produce to the court.

On the 28th October, 1837, Martin A. Lea, of the firm of Lea & Langdon, called on the complainant for a settlement. He presented no regular account, but *memoranda,* made on detached pieces of paper; said that his firm had paid a note for $1920, which the complainant gave to David Harding, as also other liabilities, and thereupon demanded security for their re-payment. Confiding in the integrity of Lea, and that all errors would be corrected, the complainant gave his note $3298 97-100, dated the 28th of October, 1837, payable on the first of January thereafter; with interest from the date. At the same time, he executed a deed of trust with the view of securing the payment of the note,

by which he conveyed to Wm. Chambers six negroes, (whose names are particularly stated.) These negroes were to remain in the possession of the complainant until a sale was necessary, unless he should attempt to remove them without the county of Marengo. The trustee was invested with power to sell on the request of L. & L. upon advertising time and place, &c.

In February, 1838, Messrs. Lea & Langdon handed to the complainant a very imperfect account of his dealings with them, which is unsatisfactory and erroneous; occasionally charging the complainant with a sum of money, which is unexplained by any specification—embracing a period from the 20th April, 1837, to 13th February, 1838. L. & L. have not furnished an account current for the time intervening the 10th November, 1836, and the 20th of April, 1837, although the thirty-nine bales of cotton were shipped to them during that period.

It is further stated, that the consideration of the last note, which complainant gave to Lea & Langdon, is wholly unfounded, and was obtained by fraud; that they claimed of him the following sums for cash paid for his account and benefit, viz: $570 60-100, amount of draft paid J. G. Harvey; $737, amount of draft paid Webb & Dugger; $1920, amount of a note given by the complainant to David Harding. Whereas, it is charged that these drafts and notes have never been paid by L. & L., but are demanded of the complainant, and suits have been brought against him for their recovery; and on the two former, judgments have been recovered. These several items amount to a sum sufficient to extinguish the note of the complainant. Besides, the complainant sent L. & L. his crop of cotton in 1837, making 17 bales, which, by account of sales rendered the 24th January, 1838, yielded the nett sum of seven hundred and twenty-one 75-100 dollars.

The complainant alleges, that the trustee in the deed, on the 31st December, 1838, against his consent, and in despite of his remonstrances, removed the slaves, therein mentioned, from his possession, and imprisoned them in the jail of Perry county—saying he was instructed to do thus, &c.

The bill prays, that a subpoena may issue to Lea & Langdon and Chambers; that an account may be taken between the two former and the complainant, and if nothing be found due Lea & Langdon, then the collection of the note, either by suit or sale under the deed of trust, be injoined; or if part only be due,

then the residue of the note be injoined. And if the note and deed of trust made to secure its payment, be found to have been obtained by fraud, then the same may be delivered up to be cancelled, &c. In the meantime, that the trustee be injoined from selling the slaves until the further order of the court; and that such other relief as may be proper, be granted, &c.

An injunction was awarded to restrain the trustee from selling, &c., and requiring the complainant to give bond with surety, conditioned for the forthcoming of the property; which latter requisition was complied with, and the injunction issued.

The defendants, Lea & Langdon, filed a joint answer, in which they admit that the complainant and themselves made a settlement of their accounts on the 10th November, 1836, and that he gave them his note, as stated in the bill; they also admit the mistake of $124 77 for bacon, including commissions and interest; but this mistake, they affirm, was corrected with the assent of the complainant. They admit that complainant has possession of his note, that it was given up to him, and the amount carried to a new account; which new account they undertake to exhibit with their answer.

In the winter of 1836-'7, these defendants state, that they received of the complainant forty-one bales of cotton, four of which were sold in Liverpool for the sum stated by the complainant; an account of sales of the residue, and an appropriation of the proceeds, appear by the account above mentioned. All the cotton ever sent to the defendants are but seventy-three bales, the sales of which are shown by the accounts exhibited with their answer, which they aver is correct.

These defendants also admit, that the complainant gave them a note on the 28th October, 1837, as stated in his bill, but they deny that the payment of the note, made by the complainant and Walke, formed any part of its consideration. They never said that they had, or would pay this latter note. They admit the execution of the deed of trust, as alleged, and exhibit an account of the transactions between the complainant and themselves "from beginning to end." Admit that they have not paid drafts to Harvey, and Webb & Dugger, though they have charged commissions for accepting them. Taking the original in connection with the amended answer on this point, and there is a positive denial of the fact, that the complainant was charged with the amount of these drafts, or any part of either of them, as cash

66

paid for his use by these defendants. They admit the receipt and account of sales for complainant's crop of cotton grown in 1837, and aver that he was duly credited for the amount, as shown by the account exhibited.

They deny all fraud in obtaining the note and deed of trust; and aver that they were voluntarily given by the complainant. Admit removal of the slaves by the trustee to have been forcibly, yet they insist peaceably, made for the purpose of sale under the deed of trust. They believe that the slaves are not worth more than the amount of the debt they were intended to secure.

The defendant Chambers denies all fraud, or intention to oppress the complainant, affirms that he acted under instructions from his co-defendant Lea; that in removing and imprisoning the slaves his only object was to have them forthcoming on the day of sale.

Several witnesses were examined at the instance of the complainant. Billups Gayle, cashier of the Branch Bank at Mobile, testifies, that on the 19th of February, 1838, complainant's note for $2733 17-100 was discounted by that Bank, and the proceeds, $2707 21-100, went to the credit of Lea & Langdon. This note matured the 13 | 16th of April, and was paid, but by whom the books of the Bank do not show. On the 16th of April, 1838, complainant's note $2707 was discounted, and the proceeds, $2676 15-100, went to the credit of Lea & Langdon. This note matured on the 15 | 18 June, was paid, but by whom does not appear. On the third of May, 1838, the note of the complainant, with Wm. M. Burrell and John Burke as joint makers, was discounted for $1000, and the proceeds $954 33-100, went to the credit of Lea & Langdon. The proceeds of the notes were checked out at various times—the last note matured on the 3 | 6 of February, 1839, and was protested for non-payment; but was paid on the 20th of October, 1840, with one hundred dollars in cash, and a joint note of James Burke and Solomon Rhodes, payable on the fourth of April, 1841; which last note was unpaid in January, 1842, when the witness's deposition was taken. This witness testifies alone from what he finds on the books of the Bank—the entries in which were made before he came into office.

John M. Walke, also a witness for the complainant, testifies, that Lea, of the firm of Lea & Langdon, told him that the firm had paid a note in which the complainant was the principal, and

the witness a surety, for $1920, payable to David Harding; that they had paid it as commission merchants for the complainant, and charged him with it in his account current; and that the complainant, in 1838, executed a deed of trust on four or five negroes, to secure its payment. Complainant showed witness an account current of Lea & Langdon against him; in that, the note alluded to, was not charged.

David Harding, another witness for the complainant, proves, that he had the note of the complainant, in which J. M. Walke was a surety, for $1920; this note he indorsed to John Bloodgood, who sued him as indorsee. Langdon, of the firm of Lea & Langdon, told witness and Bloodgood, that Roane had deposited with the firm a sum sufficient to pay off the note with interest. No execution has ever issued against witness in the suit of Bloodgood, nor has he had any farther trouble about the matter. Langdon stated that he had paid over the money to Wm. Gordon, the counsel for Bloodgood in the suit against the witness.

Witness was present when a conversation took place between the camplainant and Lea, of the firm of Lea & Langdon, at Woodville, in respect to a settlement; Lea had no account with him, but referred to several sums of money which his house had advanced for the complainant, viz: the amount of the note made payable to this witness above referred to, and a draft to Harvey, and another to Webb & Dugger. Lea insisted they had paid them, and urged the complainant to settle by note; but the latter objected unless an account was rendered, and asked the advice of the witness, who told him that he should insist upon an account and the production of the liabilities that they might be cancelled. Lea seemed well satisfied, said complainant would do what was right, and invited him to take something to drink. Late in the evening, complainant and Lea called on witness in a state of intoxication; the latter remarked, that the former had settled with him, and had given his note for $3000 or upwards, and executed a deed of trust for its security on six negro men, to Wm. Chambers as trustee. The complainant then called on witness to take notice, that if, upon the exhibition of L. & L.'s account, he should owe them nothing, then the deed of trust should be void in toto, or if his indebtedness should be less than the note, then the deed should be void so far as it was not sustained by a consideration. To all this, Lea assented. Complainant, at the same time, in-

sisted, that the note made by Walke and himself was paid with money which he had furnished Lea & Langdon for that purpose. Lea said, if, upon examination, such should appear to be fact, the deed should be void to the amount of the note. Witness thinks deed of trust was made in the fall or spring of 1838; he was not present when it was executed, but saw complainant very soon after, and thought him too drunk to attend to business of so much importance.

When the settlement was first attempted, Lea said he had no account current with him, but insisted that his firm had advanced money for the complainant to different persons; which the latter denied, and called upon Lea to say to whom they had paid money for him. Lea mentioned the note of complainant and Walke, above referred to; this, the complainant insisted, had been paid with money placed by him in L. & L.'s hands; he then mentioned the drafts in favor of Harvey, and Webb & Dugger; these, the complainant contended, were paid with the proceeds of cotton which he had shipped them.

The chancellor was of opinion, that the note, made by the complainant in October, 1828, as well as the deed of trust, executed with the view of securing its payment, was obtained by fraud and misrepresentation; that they were consequently void, and could not be enforced for the purpose of collecting any balance that might be due to Messrs. Lea & Langdon. It was accordingly ordered and adjudged, that the same be delivered up to the complainant for cancellation; and that Lea & Langdon pay the costs of the suit.

W. M. Murphy, for the plaintiffs in error, insisted—

1. That the account of the transactions between the complainant and Lea & Langdon, exhibited with the answer of the latter, was to be considered as responsive to the allegation of the bill, which declared that no account current had ever been produced, and prayed that it might be furnished. [Paulling v. Sturgus, 3 Stewart's Rep. 95; McGowen v. Young, 2 Stewt. & P. Rep. 160.] This account shows an indebtedness for only $668—less than the amount of the note in question; and this, although the complainant is not charged for advances on account of the note to Harding or the drafts to Harvey, and Webb & Dugger.

2. Even admitting that Lea may have made a misrepresenta-

Langdon, et al. v. Roane's Adm'r.

tion to the complainant at the time the note was given, yet if any thing is due Lea & Langdon, the deed must stand as a security *pro tanto*. [2 Story's Eq. 7–8; 11 Wheat. Rep. 103; 12 East's Rep. 637–8; 1 Story's Eq. 213, 498; 3 Ala. Rep. 448.] If Lea & Langdon were seeking to set up the deed in equity, that court might perhaps refuse its aid.

3. The complainant was a cotton planter, and had no other means of payment than his cotton crops—the account shows how the proceeds of every sale were disposed of. An account is only asked for from 10th November, '36, to 13th February, 1838; consequently, the answer of Lea & Langdon does not show what disposition was made of the money received from the Bank on the note of the complainant of the third of May, 1838. As to the money received from the Bank on complainant's notes, by Lea & Langdon, it must have been paid by them, as the former had no other means of payment than his cotton, which is all accounted for.

4. Harding's testimony alone, or in connection with the other witness, does not outweigh the answer.

F. S. LYON, for the defendant, contended, that the only question which need be decided, was, whether the complainant was induced by fraud or misrepresentation to give the note of October, 1837, and the deed for its security. The proof, on this point, was ample and explicit to sustain the allegations of the bill. It is shown that the note was given in consequence of Lea's representation, that he had paid for the complainant the note given by him to Harding, and the drafts to Harvey, and Webb & Dugger. In fact, the answer of L. & L. does not negative the allegation, that the payment of these drafts formed part of the consideration for the note in question.

A *suggestio falsi* by Lea, is shown by the testimony of Walke and Harding; besides this, the manner in which the settlement was made, the discrepancy between the answer and the exhibit, are circumstances entitled to great weight. The answer of L. & L. affirms that the note is due *in toto*, while the exhibit shows that it was made for $668 53-100 too much; in addition, the proceeds of the note of $1000, received from the Bank, is not accounted for.

A *suggestio falsi*, or *suppressio veri*, whether proceeding from

a premeditated purpose to deceive, or no, vitiates the most solemn acts; and where one suggests a falsehood, without knowing it to be true or false, he is as much chargeable with a fraud, as if he knew what he asserted was untrue. [1 Story's Eq. 197, 201–2; 6 Ves. Rep. 173; 2 Wheat. Rep. 178; 2 Brown's Ch. Rep. 385–8; 1 Ves. &. B. Rep. 355; 3 id. 111; 9 Ves. Rep. 21; 10 id. 475; 13 Peters' Rep. 26.]

COLLIER, C. J.—The frame of the bill does not require that the state of the accounts between the intestate and Messrs. Lea & Langdon, previous to the 10th November, 1836, should be examined; for although the account rendered by the latter, on that day, was not strictly correct, yet the error was admitted and corrected by the parties themselves. [Davis v. Spurling, 1 Russ. & My. Rep. 64.] We have only to inquire whether there was due to Lea & Langdon, on the 28th of October, 1837, the sum for which they received the intestate's note of that date? It cannot be intended that there was a mistake in the settlement; and, consequently, the *onus* of showing an error prejudicial to the intestate, rests upon the complainant. Where parties have settled their accounts, and struck a balance, which has been adjusted by cash, or with a security for its payment at a future day, it is incumbent upon the party complaining of fraud or mistake, to allege it specifically, and to establish the allegation by proof. The agreement of the parties, which is admitted by the answer of Lea & Langdon, and proved by the deposition of Harding, that all errors should be corrected, and the deed of trust stand as a security for so much as was really due the *cestuis que trust,* cannot render inapplicable the rule we have stated. That agreement was merely affirmative of what the law was, in the absence of any express understanding.

In Chappedelaine, and another, v. Dechenaux, [4 Cranch's Rep. 306,] the bill was filed to set aside a stated account, which was signed by the parties thereto upon a suggestion of fraud; or if it be not set aside, to correct its errors, and to obtain a settlement of transactions subsequent to that account. The account stated, was pleaded in bar of so much of the bill as required, that the subject should again be opened. The court said, that the plea must be sustained, except so far as it may be in the power of the complainants to show clearly, that errors have been com-

mitted, is a proposition about which no member of the court has doubted for an instant. "No practice could be more dangerous than that of opening accounts which the parties themselves have adjusted, on suggestion supported by doubtful or by only proba-ble testimony." [To the same effect, see Blackledge v. Simpson, 1 Hayw. Rep. 259; Philips v. Belden, 2 Edw. Rep. 1; Bullock v. Boyd, et al. id. 293; Wilde v. Jenkins, 4 Paige's Rep. 481; Endo v. Caleham, 1 Younge's Rep. 306.]

It is said to be a general rule, that where an account is made up and rendered, he who receives it, is bound to examine the same, or to procure some one to examine it for him; if he admits it to be correct, it becomes a stated account, and is binding upon both parties—the balance being the debt, which may be sued for and recovered at law upon the basis of an *insimul computas-sent*. So, if, instead of an express admission of the correctness of the account, the party receiving it keeps the same by him, and makes no objection within a reasonable time, his silence will be construed into an acquiescence in its justness; and he will be bound by it as if it were a stated account. [Phillips v. Belden, 2 Edw. Rep. 1.] So in Freeland v. Heron and others, [7 Cranch's Rep. 147,] it was held, that when one merchant sends an account current to another residing in a different country, between whom there are mutual dealings, and he keeps it two years without making any objections, it shall be deemed a stated account, and his silence and acquiescence shall bind him, at least so far as to cast the *onus probandi* on him. In fact, the rule as laid down by the authorities, would seem to be, that if one does not object to a stated account which has been furnished him, within a reasonable time, he shall be bound by it, unless he can show its incorrectness. [Murray v. Toland, 3 Johns. Ch. Rep. 569; Wilde v. Jenkins, 4 Paige's Rep. 481.]

In Leaycraft v. Dempsey, [15 Wend. Rep. 83,] the court said, that where a bill is filed to open the settlement of an account, the request is not granted as a matter of course. If the account has been settled, or an instrument executed for the payment of the balance, the error should be specified in the bill. The plaintiff must show clearly, that he has been imposed upon, before the court will allow him to unravel the account. Such, also, is the decision in Philips v. Belden, [2 Edw. Rep, 1.] In the latter case, the court consider the distinction between surcharging and falsi-

fying an account, and accounting generally. It is said, where liberty is given to surcharge and falsify, the court takes the account to be a stated and settled account, and establishes it as such. If either party can show an omission for which an entry of debit or credit ought to be made, such party surcharges, that is, adds to the account; if any thing be inserted which is wrong, he is at liberty to show it, and this is a falsification. The *onus probandi* is always on the party making the surcharge or falsification. But in a general accounting, the party producing the account, to charge his adversary or relieve himself, must show the items to be correct.

The direct inference from the principles stated, is, that a party dissatisfied with a settled account, must in a bill brought for that purpose, state explicitly the grounds on which he seeks to surcharge or falsify it; and that the burthen of making out the case, rests upon him. *Further*, where a merchant furnishes his customer with an account current of his dealings, and the latter retains it in his possession for a considerable length of time, without objection, he will be presumed to have admitted its correctness.

In the present case, the allegations of the bill are attempted to be sustained, by proof that Lea informed the intestate, he had paid for him, his note to Harding, as well as his drafts in favor of Harvey and Webb & Dugger; that this statement was wholly untrue; that intestate was deceived by it, and induced to make the note and execute the deed in question. The evidence of Harding goes to this extent, and so far as it respects his note, is confirmed by the testimony of Walke. Conceding that the proof on this point is sufficient to outweigh the answer, and it by no means follows that such a case is made out as will vacate the note and deed. The conclusion will not then be warranted, that the balance due the defendants, Lea & Langdon, was not equal in amount to the note. It will be remembered, Walke testifies, that although Lea told him, his house had paid the note to Harding, yet in the account which he shewed him, it was not charged:— *Further*, it is admitted in the bill, that Lea & Langdon, in February, 1838, furnished the intestate an account current of all previous dealings. True, it is alleged that this account is imperfect, not because it charges too much, or omits any thing that is proper; but because, in noting the items stated, it is not sufficiently full and explicit. We infer that the account thus rendered, is

identical with that exhibited with the b.ll.  In fact, such an in-
ference is a necessary sequence from the case as presented; for if
they were variant from each other, it would have been entirely
competent for the complainant to have shown it; and he certain-
ly would have done'so, if the claim to relief could have been thus
strengthened.

The account exhibited shows, that after placing to the intes-
tate's credit the sum of seven hundred and seventy-one dollars
and seventy-five cents, the proceeds of seventeen bales of cotton
sold on the 20th of January, 1838, there was due to Lea & Lang-
don, a balance equal to the amount of the note, saving six hun-
dred and sixty-eight dollars and fifty-three cents, for which a
credit was given.  It is not alleged that the intestate paid the
note which he made in November, 1836, in any other manner
than by an appropriation of the proceeds of his cotton crop of that
year; nor is it denied by the bill, that he did not after the first set-
tlement, continue to deal with Lea & Langdon as previously.—
Taking the case as stated by the complainant himself, and it is
clear, that as the cotton sent by him to his factors, was insufficient
to extinguish the note, there was due to them a balance thereon;
and that that note, instead of being paid in full, was *taken up* by
making so much as was due thereon, a part the consideration of
the note given in October, 1837.  In this view, it is impossible
that the intestate could have been charged with the note of Har-
ding, and the defendants to Harvey, and Webb & Dugger; for
taking the statements of the bill to be a true, and complete deve-
lopement of the case, and the last note should have been for a
much larger amount than it really is.

Again: The intestate received the account current of Lea &
Langdon, in February, 1838, and retained it without objection, so
far as we are informed, up to the time his bill was exhibited in
January, 1839.  This, considering the distance of the residence
of the parties from each other, must be regarded as an implied
admission that the account was correct.  True, it would not ope-
rate so conclusively against the complainant, as to prevent him
from surcharging and falsifying; but the proof in the cause is in-
sufficeint to authorise relief upon either of these grounds.  In
fact, the interference of equity is not sought upon an objection to
the account, but because the intestate was overreached by Lea,
who represented to him that Lea & Langdon had made advances

67

for him to pay debts which were still outstanding. The chancellor was opinion that this allegation was made out by evidence, and that it warranted a perpetuation of the injunction; because it showed that the defendants, L. & L., had perpetrated a fraud upon the complainant. Without stopping to inquire whether the proof was such as the court of chancery supposed, we are satisfied, that the conclusion there attained cannot be supported.

Here it is admitted, and in fact proved, that all errors in the settlement were to be corrected, and the deed to stand as a security for so much as was really due. If the law were otherwise, this stipulation of the parties, would sustain the deed in despite of fraud on the part of the *cestuis que trust*; to the extract of their demand. But the chancellor's view of the law is incorrect, as applied to a case in the posture in which the present comes before us. It may be conceded as a general rule, that the enforcement of a contract may be prevented, by showing a fraud on the part of him who seeks to derive a benefit from it; unless the fraud has been assented to, or acquiesced in. But it cannot be endured that a debtor should be allowed to become an actor in equity, and avoid a security which he has given for a debt clearly due, merely because he was induced by the false representations of the creditor, made most probably in ignorance of the fact, rather than from a settled purpose to deceive. [See Barnett v. Stanton & Pollard, 2 Ala. Rep. 181.]

In respect to the notes of the intestate discounted by the branch bank at Mobile, in 1838, the proceeds of which were checked out by Lea & Langdon, it is quite enough to say, that there is no allegation in the bill in respect to them; and even if the proof establishes a liability upon Lea & Langdon to account for the money thus appropriated by them, that liability cannot be enforced in the present case.

From what we have said, it results that the complainant is entitled to a perpetual injunction for the sum of six hundred and sixty-eight dollars and fifty-three cents, to be applied as a credit on the note on the 20th of January, 1838; that as to the other matters in controversy, the bill must be dismissed. If Lea & Langdon are liable for the monies checked out of Bank, the representative of the intestate should have the benefit of them in extinguishment of the note and deed of trust; and that he may not be prejudiced in the assertion of his rights, the decree is so far modi-

fied, as to dismiss the bill without prejudice to the matter stated, as the ground of a new suit.

As it does not appear that there was a necessity for a resort to equity, to obtain the credit to which we have seen the complainant is entitled, the defendant in error will be taxed with the costs, both of this court and the court of chancery. The decree will accordingly be reversed, and here rendered in conformity to the views expressed.